UNITED STATES v. SWIFT et al. (three cases).

(District Court, N. D. Illinois, E. D. May 12, 1911.)

Nos. 4,509, 4,510, 4,511.

1. COURTS (§ 91*)—PREVIOUS DECISIONS—SHERMAN ANTI-TRUST ACT—VALID-
ITY OF CRIMINAL PROVISIONS.

Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), is primarily a criminal statute, prohibiting certain acts as unlawful restraints and monopolies of interstate trade and commerce and prescribing the punishment therefor, the jurisdiction conferred on Circuit Courts as courts of equity by section 4 to "prevent and restrain violations of this act" being made dependent on the preceding criminal sections and confined to preventing the carrying out of that which is declared in the prior sections to be criminal. Therefore every decision of the courts sustaining an injunction granted under such section has necessarily determined that the preceding sections are valid, and that the things enjoined were crimes, and in view of the numerous decisions of the Supreme Court upholding such injunctions the validity of the criminal sections is no longer open to question in the inferior courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 325; Dec. Dig. § 91.*]

2. INDICTMENT AND INFORMATION (§ 125*)—DUPLICITY—COMBINATIONS IN RE-
STRAINT OF INTERSTATE COMMERCE.

An indictment charging a combination in restraint of interstate commerce in violation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), is not bad for duplicity because it charges and enumerates different means adopted or different things done to accomplish the object of the combination.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 350-371; Dec. Dig. § 125.*]

3. MONOPOLIES (§ 31*)—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE
—CRIMINAL PROSECUTIONS—INDICTMENT.

An indictment for a combination in restraint of interstate commerce in violation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), between defendants as representatives of three different packing concerns, which charges that each concern was represented by certain individuals, each one of whom was authorized to act for the others of his "group" and that the word "group" as used therein is intended to apply to any or all of the members of the particular group, is sufficiently specific where it charges that acts were done by a particular group without averring that each particular member of such group individually took part therein.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4.** MONOPOLIES (§ 31*)—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE.

An indictment for a combination in restraint of interstate commerce in violation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), which charges that defendants were officers of certain corporations which they managed and controlled, directing the corporate action, and that the groups of defendants representing the several corporations combined together to do the illegal acts, sufficiently charges defendants as individuals.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

**5.** MONOPOLIES (§ 31*)—VIOLATION OF ANTI-TRUST ACT—INDICTMENT.

An indictment which charges acts constituting a contract, combination, or conspiracy in restraint of interstate commerce in violation of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), is good whether such acts are alleged to constitute a contract, combination or conspiracy.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

**6.** INDICTMENT AND INFORMATION (§ 59*)—REQUISITES AND SUFFICIENCY OF ACCUSATION.

An indictment is sufficient when it contains a substantial accusation of crime and its statements furnish the accused with such a description of the charge against him as will enable him to make his defense and avail himself of his conviction or acquittal for protection against further prosecution for the same offense, and when from it the court can determine that the facts charged are sufficient in law to support a conviction.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 180; Dec. Dig. § 59.*]

**7.** MONOPOLIES (§ 31*)—ANTI-TRUST ACT—OFFENSES.

An indictment alleging facts which show that defendants control three extensive packing concerns doing an interstate business and controlling the larger part of the business in the states in which they operate; that they have combined together in a plan to eliminate competition between such concerns by an agreement not to bid against each other for live stock, but to bid exactly the same amounts for like grades, and by fixing a uniform selling price to be charged by each, and apportioning among themselves the total business done according to the financial interest of each—charges a contract combination or conspiracy in restraint of interstate commerce in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, § 1. 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

Proceedings by indictments against Louis F. Swift and others. On demurrers to indictments. Overruled.

See, also, 186 Fed. 1002.

Geo. W. Wickersham, Atty. Gen., Edwin W. Sims, U. S. Atty., Wm. S. Kenyon, James H. Wilkerson, Pierce Butler, James M. Sheean, Oliver E. Pagan, Elwood G. Godman, and Barton Corneau, for the United States.

John S. Miller, Moritz Rosenthal, Levy Mayer, George T. Buckingham, M. W. Borders, Albert Veeder, Henry Veeder, Alfred R. Urion, and Ralph Crews, for defendants.

CARPENTER, District Judge. First I will dispose of the contention that the provisions of the Sherman act (Act July 2, 1890, c. 647,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) are "too indefinite and uncertain in defining the elements or constituents of the crime to justify the indictments, and punishment thereunder by imprisonment or fine."

[1] In this connection I may say that great skill and ability have been exhibited by the counsel for the defendants in analyzing the various decisions of the Supreme Court of the United States which have passed upon the Sherman act. In the view which I take of those decisions, it will not be necessary for me to determine whether the Congress of the United States meant exactly what it said in passing that act, or whether its meaning was to depend upon judicial construction. If the matter had come to me as an original proposition, I would be obliged to say, having due regard to the three independent branches of our government, that the sole power to make the law rested with the legislative branch, and that the sole power of the courts, being satisfied that the legislative body had not exceeded its constitutional authority, was to interpret and enforce the law as made; that the power of the courts is to interpret, rather than to create, a law. This statute defines the acts declared to be unlawful in simple English. The purpose of the act, when ascertained from the language used, is as clear as may be. The legislative purpose inspiring its passage is interesting as a matter of history, but in the absence of ambiguity or uncertainty in the words or phrases used, is, legally speaking, at least unimportant. Canons of construction and means used commonly by the courts to determine legislative intent serve only to confuse when that intent is clearly expressed. Rules of construction serve no good purpose when there is nothing to construe. Courts ought not to interpret that which has no need of interpretation, and, when the words of a statute have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning. Statutes and contracts should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced construction for the purpose either of limiting or extending their operation. Beardstown v. Virginia, 76 Ill. 40. Courts are not concerned with the advisability of legislation, viewed either from a political or economical standpoint; and it would seem unnecessary to observe that, acting within the limits of the Constitution, the Congress of the United States is supreme and independent. Its enactments represent the law until they are repealed.

However that may be, the statute now under consideration has been the subject of decision for 20 years. The Supreme Court of the United States many times has sustained decrees which restrained violations of it. The individual justices of that court have differed, not on the constitutional power of Congress to pass a penal statute relating to interstate commerce, but as to whether or not a given case has come within its condemnation. In four cases at least a decree or judgment based upon that statute was sustained by that court, and without dissent. Montague v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608; Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52

L. Ed. 488; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518.

The Sherman act is entitled "An act to protect trade and commerce against unlawful restraints and monopolies." It is essentially a penal statute. Sections 1, 2, and 3 declare what is illegal, and provide for punishment in case of violation. Section 4 declares that:

"The several Circuit Courts of the United States are invested with jurisdiction to prevent and restrain violations of this act, and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. *  *  * "

Section 7 provides:

"Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue in any Circuit Court of the United States *  *  * and shall recover threefold damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

Congress aimed effectually to prevent restraint of trade in interstate commerce. It had constitutional power to accomplish this purpose by making restraints of trade criminal acts; or, without making them criminal, by empowering the United States, as complainant, to secure injunctions against acts which constitute restraints of trade, or by doing both. By passing the Sherman act it did both. The result could have been accomplished in several ways. Congress could have enacted two separate statutes, the one providing that acts done in restraint of trade should be criminal and punished as such; the other providing that the condemned acts should, on the application of the government, be enjoined in the civil courts. It could have passed one statute instead of two, and provided in one section that the various acts in restraint of trade should be criminal, and punished, and in the second section have declared that the same acts in restraint of trade could, on the application of the government, be enjoined.

If it had passed two separate statutes, then clearly, and if it had passed one statute, then possibly, the two statutes and the two sections respectively would be construed independently of each other. As to the two statutes, this requires no discussion. As to the single statute, if it combined both remedies it could not be called primarily a criminal statute or primarily a civil statute. The two essential objects obviously would be distinct, and each would be tested by its own language in determining its constitutionality. In that event it could be argued that the criminal section, worded broadly as in the Sherman act, was not specific enough; that it did not declare the exact nature of the offense, and that no one could know in advance what the law condemned, and therefore no indictment, or at any rate no indictment in the language of the statute, would be valid. And this, notwithstanding the fact that the civil statute would not be, for the purpose of an injunction, subject to the same objection. If such a statute had been passed, and if under it the Supreme Court had upheld the constitutionality of the act in equity cases, such decisions

would not absolve this court from the obligation of considering the constitutionality and validity of the criminal section.

Such, however, is not the act which was passed by Congress. The Sherman act is primarily a criminal statute. Its title announces its purpose. Sections 1, 2, and 3 declare certain things to be illegal, and prescribe punishment for their doing. The equitable remedy provided by section 4 does not authorize the Circuit Courts of the United States to enjoin restraints of trade, as such; it does not subject to the processes of a court of chancery, contracts, combinations in the form of trusts or otherwise, or conspiracies or monopolies, in restraint of trade, either definitely or indefinitely. On the contrary, it invests the Circuit Courts of the United States with jurisdiction to prevent and restrain "violations of this act"; and it is a well-known fact that the courts of the United States have no jurisdiction, except such as is conferred upon them by Congress. Here the jurisdiction of the equity courts is made dependent upon the criminal sections. If sections 1, 2, and 3 were repealed by Congress, there would be nothing left of the law to which sections 4 and 7 could apply. It is impossible to give effect to the equity sections without reference being had to the criminal section. It authorizes the processes of the Chancery Court to be used only to prevent the carrying out of that which is declared in the prior sections to be criminal. It follows, therefore, that unless that which is sought to be enjoined is a violation of the act under one of the preceding sections, in other words, that, unless that which is sought to be enjoined is a crime, it cannot be enjoined, because it is only that which is made a crime by the statute which is subject to the equity jurisdiction. Therefore, if injunctions heretofore have been upheld by the Supreme Court, the Supreme Court in upholding them necessarily has determined that the things which were enjoined were crimes, as defined by one at least of the first three sections of the act. If, however, as is contended, the first three sections of the act are void, there could be no "violation of this act" susceptible of being enjoined. Whether or not there is any merit in the argument on behalf of the defendants is not a matter for this court at this time even to consider, in view of the fact that in the judgment of this court the decisions of the Supreme Court upholding injunctions necessarily involve the proposition that certain things are made criminal by the statute, and that therefore the criminal sections of the statute necessarily must be valid.

The same is true as to the jurisdiction under section 7. Recoveries have been sustained by the Supreme Court under that section. Montague v. Lowry, supra; Loewe v. Lawlor, supra. And yet the only authority there vested in the Circuit Court was to award threefold the damages sustained by any individual "by reason of anything forbidden or declared to be unlawful by this act." Nothing is forbidden in terms. Many things are declared to be unlawful. Unless they were unlawful, as defined in the criminal sections, no relief could have been given under section 7. It might be said, of course, that the Supreme Court, in passing upon these civil cases, acted without consideration of the logical extension of the exercise of the civil jurisdiction, and

without argument as to the possible invalidity of the first three sections as a criminal statute, and that a decision even of the Supreme Court holding the civil section valid, although logically necessarily involving a holding that the first three sections are also valid as penal sections, should not be deemed binding upon this court. This argument, however, is inapplicable, because it was pressed strongly upon the Supreme Court in the Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, that the criminal sections were invalid for the reasons urged here, and that for that reason the equity sections could not be enforced. Argument of Young, Northern Sec. Case, 193 U. S. 262, 264, 24 Sup. Ct. 436, 48 L. Ed. 679, Argument of Johnson, 193 U. S. 270, 24 Sup. Ct. 438, 48 L. Ed. 679, Argument of Griggs, 193 U. S. 279, 24 Sup. Ct. 439, 48 L. Ed. 679, Argument of Grover, 193 U. S. 285, 24 Sup. Ct. 442, 48 L. Ed. 679, Argument of Stetson, 193 U. S. 292, 24 Sup. Ct. 443, 48 L. Ed. 679, where he said:

"This act is a criminal statute pure and simple, and its meaning and effect as now determined must also be its meaning and effect when made the basis of a criminal proceeding."

The contention, however strongly urged, did not affect the conclusion of the court. I am of the opinion, therefore, that the Supreme Court of the United States has determined that sections 1, 2, and 3 of the Sherman act define with sufficient accuracy the offenses therein enumerated.

[2] It is urged also that the first and second counts of indictment No. 4,509 are bad for duplicity, because they charge a combination in restraint of trade in the purchase of live stock, and also in the sale of fresh meat. The objection is not sound. The crime charged is a combination in restraint of trade. Such a combination may design to accomplish its object in many different ways, and the enumeration of the various means adopted does not render the indictment bad for duplicity. Duplicity in an indictment means the charging of more than one offense, not the charging of a single offense committed in more than one way. Duplicity may be applied only to the result charged, and not to the method of its attainment. Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300; Connors v. United States, 158 U. S. 408, 15 Sup. Ct. 951, 39 L. Ed. 1033.

[3] Counsel for defendants also contend that counts 1, 2, and 3 of indictment No. 4,509, and indictments Nos. 4,510 and 4,511, are fatally defective by reason of the use of the word "groups" as designating the defendants representing the Armour, Swift, and Morris concerns. The indictments show that the Armour, Swift, and Morris interests were represented each by certain individuals, and the individuals composing each class are designated as "the Swift group, the Armour group, and the Morris group." This is followed by the charge that each member of each group had full authority to act for his group, and that whenever the word "group" is used it is intended to apply to any or all of the members of each group. In other words, the charge against a group is to be taken to mean that whatever was done was done by one of the members of the group in behalf and by

authority of all. In this connection it is argued, "first, that not all of the defendants are charged with the commission of acts; and, second, that those charged and those not charged cannot be separated from each other under the averments." Grand jurors are required to state their charge with as much certainty, and no more, as the circumstances of the case will permit. In this case the jurors knew the men engaged in the matter under their investigation; knew with which of the three great concerns (Armour, Swift, or Morris) each one was associated; believed that they were of one mind as to the plan of operation of their business. It was not known, and probably could not have been discovered, what part in the general programme was assigned to each individual. The practical way, and probably the only possible way, was for the jury to charge as it did that the combination was entered into by the separate groups of men, and that the action of each group was with the consent, knowledge, and design of each constituent member. The indictments charge an unlawful combination, conspiracy and monopoly as a result of joint action, and it is not necessary, to sustain those charges, that each one of the individual participants should have been doing the same thing at the same time. United States v. MacAndrews (C. C.) 149 Fed. at page 832. It is quite consistent with a charge of combination or conspiracy or monopoly that the individuals concerned therein should each have been assigned to different tasks, aimed to bring about the result planned by all. The indictments charge the ultimate plan, the specific acts by which it was carried out; and, further, that those specific acts were planned and executed by the three groups of individuals, each member of each group acting for himself and every other member of the group. I do not see how the grand jury could have made the charge more definite, and believe that it is sufficiently specific to satisfy the substantive law.

[4] The point is made against the counts of indictment No. 4,509 that they fail to charge properly the defendants with responsibility for the acts done; that it appears that the defendants were officers of corporations, and that they could not be liable for corporate doings unless it appeared clearly that they knew of, connived at and directed the things done. The answer to this is found in the indictment, which charges, not that the corporations, but that the groups of individual defendants, did what was alleged to be unlawful; and further, that the defendants managed and controlled the various corporations, and directed the corporate action. More was not necessary.

[5] Much stress is laid upon the proposition that indictment No. 4,509 is bad as describing a conspiracy or a contract in restraint of trade, and calling it a combination. The obvious answer to this is that it makes no difference what the grand jury labeled the offense. The question is, Do the facts as stated amount in law to any offense? If the acts charged in this indictment constitute a contract, combination in the form of trust or otherwise, or a conspiracy in restraint of trade or commerce, it is a valid indictment, so far as this objection is concerned.

[6] It is apparent that the foregoing objections to the indictment go to matters of form rather than to matters of substance. An in-

dictment is well enough that states facts which constitute a crime, and in language which leaves no doubt in the minds of the defendants of what they are accused. It is true that a defendant should be informed clearly by the indictment of the exact and full charge made against him, yet the manner in which the information is given is unimportant. An indictment is sufficient when it contains a substantial accusation of crime, and its statements furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against further prosecution for the same offense, and when, from it. the court can determine that the facts charged are sufficient in law to support a conviction. Hume v. United States, 118 Fed. 689, 55 C. C. A. 407. The present indictments fulfill all of these requirements. Moreover, section 1025 of the Revised Statutes (U. S. Comp. St. 1901, p. 720) provides:

"No indictment found and presented by a grand jury in any District or Circuit or other court of the United States shall be deemed insufficient, nor shall the trial, judgment or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

[7] This brings us to the question whether or not the indictments charge facts sufficient in law to support a conviction under the Sherman act, and for answer we must look to the facts stated, and not to any conclusion drawn from those facts by the grand jury. The indictment in case No. 4,509 charges in substance that there has been carried on from Chicago (and other named cities in different states) an extensive industry involving (1) the purchase of live stock; (2) the slaughter of such stock; and (3) the furnishing of fresh meats to the people in certain named states; that 85 per cent. of all fresh meats consumed in the named states has been slaughtered in those cities in designated proportions; that 70 per cent. of this 85 per cent. "has been carried on, directed and controlled" by the defendants; that the Armour group had branch houses in 317 different towns and cities in different states; the Swift group 280; and the Morris group 82; that the defendants, divided into three groups representing certain corporations or interests, managed, controlled, and directed by them, entered into an agreement: First, that they would not compete in the purchase of live stock, and would make uniform bids for animals of like grade. Second, that the three groups by agreement adopted a uniform system of determining the sale price of dressed beef by adding to the cost of the animal on the hoof certain fixed and excessive charges to cover operating expenses, and by deducting certain inadequate allowances for by-products. Third, that each group would direct its sales agents to sell at the prices figured according to the agreement, or, if not at that price, at a certain other price also agreed upon. That by agreeing on the amounts to be paid for the live stock, and upon the amounts to be added for operating charges, and the amounts to be deducted for by-products, and in reaching a uniform sale price they have eliminated all competition in the fresh meat industry between the three groups of defendants. That they

were large operators in interstate commerce, and by a combination among themselves they have agreed upon a system which restricted the business of each individual group. The medium through which all groups collected information and operated was the National Packing Company, organized, owned, and directed by the groups collectively. Its office furnished a common meeting ground, and there the total business done by all the defendants, by agreement, would be equalized from time to time, each being permitted to share according to its financial interest, and prices were kept up by increasing or decreasing shipments to particular territories according to market conditions. The whole plan, from its inception, appears plainly to be one to eliminate competition as a factor in fixing prices among the three groups of defendants, beginning with the agreement not to bid against each other, and in fact to bid exactly the same amounts for like grades of live stock, determining a uniform selling price, and ending with fixing a uniform sale price and an apportionment among themselves of the total business done.

Indictments Nos. 4,510 and 4,511 charge substantially the same facts (1) resulting from a conspiracy, and (2) creating a monopoly.

The defendants urge that three great concerns operating side by side, and conducted by men of great business skill, might arrive at the same system of doing business (the tendency to introduce efficiency methods into our industries might indicate such a possibility); and that all the indictments charge is that the defendants adopted a uniform system of doing business. It need not be disputed that given the same ability, facilities, and capital invested, these three groups of individuals might arrive at very nearly the same method of determining the sale prices of their articles, and that they would endeavor, so far as possible, to obtain such price. The adoption by the defendants of such a system might be accidental or a mere coincidence, but the difficulty with the argument is that the offense charged is not the accidental adoption of a uniform system of doing business, resulting in the fixing of prices, but a system which is the result of concerted action—the result of a combination, conspiracy, or a positive agreement. The law says there may be no contract, combination, or conspiracy in restraint of trade. It is not aimed against accidental restraints of trade. The defendants could not be held for a moment had each group, acting in its own interest, arrived at the identical system of doing business, under which, it is charged, they were operating. It is the maintaining of that system by agreement or combination which constitutes the offense defined by the Sherman act, provided it results in a restraint of trade, and such a result in this case is direct and inevitable. The aim of the parties is the same, although reached by different means, as that in the Addyston Pipe Case, where the agreement was that the low bid would be made by one concern, and that the other concerns would make a somewhat higher bid, and that ultimately all would share in the profit.

I am of the opinion that the facts stated in the indictments show clearly a plan or scheme organized and put in operation by the defendants, the ultimate purpose of which was to control the production,

sale, and distribution of fresh meat throughout a large section of this country; and, as incidental to that control, to lower prices to the producer of the raw material, and raise prices to the consumer of the finished product. While the facts do not disclose an absolute monopoly, yet the large percentage of the business which they control indicates that they intended to acquire at least a commercial monopoly. As Judge Hough said in United States v. MacAndrews (C. C.) 149 Fed. at page 833:

"Commerce among the states is not a technical legal conception, but a practical one drawn from the course of business. The criterion as to whether any given business scheme falls within the prohibition of the statute is its effect upon interstate commerce, which need not be a total suppression of trade nor a complete monopoly; it is enough if its necessary operation tends to restrain interstate commerce, and to deprive the public of the advantages flowing from free competition."

The indictments show an agreement, combination, conspiracy and monopoly directly restraining interstate trade. My reading of the indictments is confirmed by the record in the present cases, and has received the sanction of the Supreme Court of the United States.

On May 10, 1902, the district attorney for the Northern District of Illinois filed in the Circuit Court of the United States, in this Circuit, a bill or petition in chancery (case No. 26,291), against these defendants and various corporations and other persons. That action was brought under section 4 of the Sherman act, and charged the defendants with substantially the same matters and things charged in these indictments. A final decree was entered restraining the defendants from—

"entering into, taking part in or performing any contract, combination or conspiracy, the purpose or effect of which will be, as to trade and commerce in fresh meats between the several states and territories and the District of Columbia, a restraint of trade, either by directing or requiring their respective agents to refrain from bidding against each other in the purchase of live stock, or collusively and by agreement to refrain from bidding against each other at the sales of live stock; or by combination, conspiracy or contract raising or lowering the prices, or fixing uniform prices, at which said meats will be sold, either directly or through their respective agents, or by curtailing the quantity of such meats shipped to such markets and agents. * * * *"

On May 26, 1903, a new petition was filed, setting out a continuance by the defendants of the matters stated in the original bill.

On December 6, 1910, the defendants in the present proceedings filed their sworn petition, setting out the pleadings and orders in chancery suit No. 26,291, and moved this court for an indefinite stay of proceedings. On page 64 of that sworn petition, at paragraph numbered "eighth" it is stated:

"The contemplated acts and transactions of these petitioners restrained and enjoined by said original decree, and the supposed acts and transactions of these petitioners alleged, charged and complained of in said new petition, are the same acts and transactions and are identical in substance and effect."

That same petition then charges, on page 65, in paragraph numbered "ninth" that the grand jurors returned indictment No. 4,509 in which the petitioners were charged with certain offenses, and then continues:

"The alleged acts and transactions of these petitioners charged in and by said indictment to have constituted such combination in restraint of trade and such violation of said anti-trust act are the same identical acts and transactions which are alleged and charged in said new petition against these petitioners."

And on page 66:

"The particular supposed acts and transactions alleged in said indictment No. 4,510 as constituting said illegal conspiracy and said violation of said anti-trust act are the same identical acts and transactions, and not others, which are alleged in said new petition."

And further, on the same page:

"The supposed acts and transactions alleged in said indictment No. 4,511 as constituting the said alleged monopoly are the same identical acts and transactions, and not others, as those charged and alleged against these petitioners in and by said new petition."

The same counsel represented the defendants then as represent them on this demurrer, and even if there were doubt (and I believe there is not) as to whether the bill in chancery charged the same facts as are charged in these indictments, we have the judgment of the defendants themselves that the facts are substantially the same. These indictments were specific enough to warrant the defendants in stating this under oath.

The decree of the Circuit Court in the chancery case was reviewed in the Supreme Court of the United States, and in all essential particulars was sustained, Mr. Justice Holmes delivering the opinion, and all the other members of the court concurring. Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518. The court there said:

"The scheme, as a whole, seems to us to be within reach of the law."

In the light of that decision, and upon principle, it follows that the indictments in this case state facts which amount in law to a violation of the Sherman act.

The demurrers will be overruled.