UNITED STATES of America,
Plaintiff,

v.

PROCTER & GAMBLE COMPANY et al.,
Defendants.

Civ. A. No. 1196–52.

United States District Court
D. New Jersey.

Sept. 22, 1960.

See also 25 F.R.D. 252, 485.

Margaret H. Brass, Antitrust Div., Dept. of Justice, Washington, D. C., Chester A. Weidenburner, U. S. Atty., by Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J., for plaintiff.

Cahill, Gordon, Reindel & Ohl, by Jerome Doyle, New York City, O'Mara, Schumann, Davis & Lynch, Jersey City, N. J., for Colgate-Palmolive Co.

Arnold, Fortas & Porter, by Abe Fortas, Washington, D. C., Bailey & Schenck, Newark, N. J., for Lever Bros. Co.

Royall, Koegel, Harris & Caskey, by Kenneth C. Royall, New York City, Dinsmore, Shohl, Dinsmore & Todd, by Richard W. Barrett, Taft, Stettinius & Hollister, by Charles Sawyer, Cincinnati, Ohio, Toner, Crowley, Woelper & Vanderbilt, Newark, N. J., for the Procter & Gamble Co.

Davies, Richberg, Tydings, Landa & Duff, by Shelby Fitze, Washington, D. C., McCarter & English, Newark, N. J., for Assn. of American Soap & Glycerine Producers, Inc.

HARTSHORNE, District Judge.

When this case was before our highest Court previously, the Court, after alluding to the claim that "the prosecution was using criminal procedures to elicit evidence in a civil case," said:

"* * * If the prosecution were using that device, it would be flouting the policy of the law * * * For all we know, the trails that looked fresh at the start faded along the way. What seemed at the beginning to be a case with a criminal cast apparently took on a different character as the events and transactions were disclosed." United States v. Procter & Gamble Co., 1957, 356 U.S. 677, 683–684, 78 S. Ct. 983, 987, 2 L.Ed.2d 1077.

Thus the Court alludes to the lack of proof before it at that time, as to whether this case did, or did not, come within that condemned category of those where the Department of Justice was using the Grand Jury "to elicit evidence in a civil case." The Court concluded that if that misuse were the case, "the criminal procedure is subverted" and "'good cause' [exists] for *wholesale* discovery and production of a grand jury transcript", taken under such conditions, to the defendants in order to nullify the advantage thus illegally obtained by this unlawful use of the Grand Jury by the prosecution.

It should be noted that, until the enunciation of the above principles of law by our highest Court in this case, the United States Department of Justice had held the view that the law was to the contrary, and that the Government had the legal right to use the Grand Jury simply to elicit evidence in and for a

civil case. Such is the testimony taken in this case of former Attorney General McGrath, who held that office when the Grand Jury in question was impanelled, and such is the memorandum written at that time by Victor H. Kramer, the then head of the Litigation Section of the Antitrust Division of the Department of Justice. It is also the public statement at that time of former Assistant Attorney General, now Judge, Barnes. (Testimony May 12, 1955 before Special Antitrust Subcommittee of the Judiciary Committee, House of Representatives)

Since the defendants were naturally particularly desirous of seeing the testimony of the many witnesses before the Grand Jury herein, which sat for well over a year, they proceeded, after the above decision, in turn by interrogatories, by demand for the production of Government documents under F.R.Civ. P. 34, 28 U.S.C.A., and by deposition, to seek to prove that there had been such a misuse of the Grand Jury entitling them to see this Grand Jury evidence. The answers to such interrogatories revealed the fact that on November 14, 1952, toward the close of the Grand Jury hearings, Attorney General McGranery, who had succeeded Attorney General McGrath, approved the recommendation of the then head of the Antitrust Division, Mr. Newell Clapp, that the Grand Jury not be asked to find an indictment, but that a bill in equity be filed for "divestitures or dissolutions imposed in civil proceedings" upon the basis of the evidence produced before the Grand Jury. Upon such proof, this Court then ordered that the transcript of the evidence before the Grand Jury, taken after the approval of the above mentioned recommendation by the Attorney General, be made available to the defendants.[1] See United States v. Procter & Gamble Co., D.C.1959, 175 F. Supp. 198.

On the theory that this action by Attorney General McGranery might in fact have been the attitude of the Department of Justice from the very beginning, the defendants then demanded the production of extremely voluminous intraoffice documents of the Department of Justice bearing upon this case. This at once raised the question of governmental privilege. See opinion, United States v. Procter & Gamble Co., D.C., 25 F.R.D. 485. The parties as well took the depositions in that regard of former Attorneys General McGrath and McGranery, of Mr. Browning, the then Executive Assistant to Mr. McGrath, and now the Clerk of the United States Supreme Court, of Mr. Morison, the head of the Antitrust Division under Attorney General McGrath, of Mr. Clapp, the head of the Antitrust Division under Attorney General McGranery, of Mr. Kramer, the former head of the Litigation Section of the Antitrust Division and of Mr. Walker Smith, in actual charge of the Grand Jury when it sat at Newark.

The resultant question now before this Court thus is, whether or not, from the very beginning, the prosecution had been using criminal procedures to elicit evidence in a civil case.

The crux here is, what did the Department of Justice intend, seek, and therefore do, when it called and actually used the Grand Jury? There are in general three possible situations as to the intention and desire of the Department of Justice during that period. (1) Did it intend and seek that an indictment result, because it believed from its previous investigation that that was the appropriate remedy? (2) Did it then have a completely open mind as to what the appropriate remedy should be, civil, criminal, or both? (3) Did it intend and seek a civil remedy solely because its previous investigation indicated that only a civil remedy would be appropriate and effective? Though, of course, in this last situation, if unexpected evidence was produced, and it became clear that a criminal remedy was not only possible but would be appropriate and effective, the Department then naturally, as for-

---

1. For special cause the Court also ordered the testimony of a deceased Grand Jury witness turned over to defendants,

180 F.Supp. 195 (supplemental opinion, 1960). But this is immaterial to the present issue.

58

mer Attorney General McGrath in fact testifies, always had the right to pursue that criminal line.

Clearly, if the first situation occurred and an indictment was intended from the beginning, there would be no misuse of the Grand Jury. This the record, as set forth below, clearly shows did not occur in this case.

Clearly, if the second situation occurred, with an indictment and a civil remedy, either or both of them intended and sought by the Government, depending on the evidence produced, there would be no misuse of the Grand Jury. This the record, set forth below, clearly shows did not occur here.

But, if the third situation occurred, and the sole intent and desire, not to say expectation, of the Government was that a civil remedy alone should eventuate, with evidence calling for an indictment as merely an unexpected bare possibility, which indictment did not then even appear appropriate, according to the then existing practice of the Department of Justice, obviously a misuse of the Grand Jury did occur, at least until that unexpected bare possibility actually eventuated. Obviously, under such circumstances, with such eventuality lacking, the Grand Jury was then being used "for the purpose of gaining evidence * * * to file a civil suit," to quote the language of Kramer, the then Chief of the Litigation Section of the Antitrust Division, in his memorandum to Morison, the then head of the Antitrust Division of the Department of Justice, written shortly before the Grand Jury was authorized in this case. Yet this last is exactly the situation that existed in the case at bar, as the record hereinafter set forth will show.

Before turning to the facts, it would be desirable to clarify the effect of the ever present, though unexpected, bare legal possibility of the production of evidence before the Grand Jury, which not merely would support an indictment, but make an indictment practically both appropriate and desirable from the standpoint of the Government. Here the well established principle must be borne in mind that equity has no general jurisdiction over cases brought for the violation of the Sherman Act, but only has jurisdiction based on a criminal violation of the Act in order to prevent the recurrence of such a violation in the future. See United States v. Procter & Gamble Co., D.C.1959, 180 F.Supp. 195,. 204; United States v. Swift, D.C.N.D. Ill.1911, 188 F. 92, 96; Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 52, 33 S.Ct. 9, 57 L.Ed. 107; In re Petroleum Industry Investigation, D.C.E.D.Va.1957, 152 F.Supp. 646. Thus the technical, if not practical, basis for an indictment must exist in every case where a civil remedy lies. If the existence of such an unexpected bare possibility suffices to constitute the use of the Grand Jury for criminal purposes, in addition to its use to obtain evidence on which to base a civil remedy, which last is definitely sought, it would then be impossible for any such misuse of the Grand Jury ever to occur. In other words, our highest Court, if such were the case, would then have spent a substantial portion of its opinion in this case in the discussion of a legal impossibility—a rather surprising conclusion.

Furthermore, as stated above, the crucial question is what the Department of Justice was actually intending and seeking to do, when it called and actually used the Grand Jury. This obviously determines the use, or misuse, of the Grand Jury in fact, not the ever present existence of an unexpected bare legal possibility, which is not being sought by the Department and which does not in the slightest affect the action of the Department of Justice in using the Grand Jury, and which is thus immaterial so far as the use or misuse of the Grand Jury is concerned.

It is in exactly this practical light that we must read the allusion in the dissenting opinion in this case of Mr. Justice Harlan, United States v. Procter & Gamble Co., 356 U.S. 677, 689, 78 S.Ct. 983, 990, 2 L.Ed.2d 1077, when he speaks

of the institution of the Grand Jury investigation "without any thought of obtaining an indictment." Obviously, from the context as well as for the above reasons, he was not there alluding to any thought as to this unexpected bare legal possibility, but to the ordinary thought of an indictment, which the Government intended and desired.

What, then, are the facts as to the intention of the United States, acting through the Department of Justice, its desires, or even expectations, previous to the decision issued by Attorney General McGranery, alluded to above, and perhaps at the very time the Grand Jury was impanelled?

■■ We must first note that we are now dealing with facts that occurred more than eight years ago, and as to which the deponents testified but a few months ago. Obviously the human memory cannot be meticulously accurate after such a lapse of time, particularly as to mere details. Hence much greater credence must be given to evidence, particularly as to matters which then appeared of relatively minor importance, if that evidence is in the form of writings made on that very occasion eight years ago, than if it is in the form of oral testimony rendered eight years after the occurrence. For the same reason, when there is a variance between evidence from the same witness, as he wrote it eight years ago in advising the Department of Justice, and his recent recollection in that regard, obviously greater reliance must be had on his contemporaneous writings. This must be borne in mind, for instance, in considering the testimony of witnesses Smith and Kramer, whose recent testimony appears to be shaded, and only shaded, a bit differently from their written advices to the Department of Justice eight years ago, as to how to proceed with the Grand Jury herein.

As noted, Smith, of the Department of Justice, was authorized to conduct the Grand Jury proceedings. But shortly before the Grand Jury was authorized and as a result of his preliminary study of the soap and detergent industry, he wrote to his superior, Mr. Kramer, on March 21, 1951, regarding the situation and the calling of a Grand Jury, alluding to

"the inadequacy of either injunctions or criminal prosecutions as remedies * * * The conclusion seems inescapable that unless divestiture or dissolution are employed * * * the Big-3 * * * will continue * * * to exploit the public with monopoly prices * * * Though we are not now in a position to make any appraisal or choice of specific relief measures, we are convinced that divestiture or dissolution is both necessary and practicable."

On receipt of this letter, Kramer at once wrote Morison, the then head of the Antitrust Division, alluding to the joint conclusion of both Kramer and Smith that "divestiture would constitute the only effective relief in the soap industry." In addition, Kramer wrote:

"You will observe that we propose to use a Grand Jury for the purpose of gaining evidence. If evidence of a law violation is obtained, we propose to file a civil suit. (Whether we should in addition file a criminal proceeding is, in my judgment, at the best highly doubtful.) I have no doubt that the use of a Grand Jury to obtain evidence of a violation of law under these circumstances is entirely appropriate and consistent with the historic role of a Grand Jury * * *"

On the very day Morison received that memorandum from Kramer, he sent a memorandum to the Attorney General recommending that a Grand Jury be impanelled in Newark to investigate accordingly. This memorandum, however, never reached Attorney General McGrath personally. It did reach the Deputy Attorney General, Mr. Peyton Ford. Ford, in his official capacity, accordingly wrote Smith the usual form letter authorizing him to take Grand

Jury proceedings in the District of New Jersey and such other steps as he might be advised. This form letter, of course, was in general terms authorizing criminal as well as other proceedings, but the actual intent of the Department of Justice was obviously "for the purpose of gaining evidence * * * to file a civil suit," recommended as above.

The evidence of Morison, the head of the Antitrust Division, and of Clapp, his successor, is to the same effect as that of Smith and Kramer, that the purpose of the Department in impanelling the Grand Jury from the very beginning was to establish the existence of a monopoly on which to base a civil complaint only. On March 23, 1951, but a couple of weeks before the Grand Jury was authorized, Morison wrote the Attorney General asking authority to impanel it, saying that this was "in order to determine whether or not the existence and operation of this apparent monopoly may be established by admissible evidence." This same intent was echoed by Morison's successor, Clapp, in his memorandum to Attorney General McGranery of November 13, 1952, toward the close of the Grand Jury sessions. In this written communication, which, be it noted, is not oral testimony based upon an eight year memory, Clapp said as to this case:

> "The basic thrust of our case will be against the monopolization. Thus this is not the type of case in which under the policy that has been in effect for the past five years or more we would proceed criminally * * *"

In this same memorandum, Clapp asked for "divestitures or dissolutions imposed in civil proceedings." These two memoranda, written some eight years ago, at the time in question, indicate that the Department of Justice had exactly the same intent to pursue civil proceedings only and not criminal proceedings, both before the Grand Jury was impanelled and at substantially the end of its lengthy sessions. What clearer evidence of the misuse of the Grand Jury could be asked?

In the order impanelling the Grand Jury be it noted that former Attorney General McGrath personally played no part whatever, if indeed he knew of its impanelling. Though he had been visited months previously by counsel for one of the defendants, apparently as a result of the preliminary investigation of the Department as to the soap situation.

All the parties and all the deponents agree that an equitable remedy leading to possible divestiture or dissolution of the defendants was what the Department of Justice as a whole had in mind as being "both necessary and practicable." But much is made by the opposing parties of the claimed difference in the testimony this year of former Attorney General McGrath, and that of his above named subordinates, on the point of possible additional criminal proceedings as well, following the Grand Jury investigation. However, to this Court it would seem that this difference in the words of such testimony was really "a distinction without a difference." While the former Attorney General testified that the "highly doubtful" possibility of an indictment, in addition to an equitable remedy, was never discussed with him, he at the same time said:

> "I am sure the Department had the right at all times to seek an indictment if information was elicited in the Grand Jury that warranted that * * *"

In other words, if this indictment possibility was not expressly mentioned at this discussion (as Morison testified it definitely was), he (McGrath) had such a bare possibility definitely in mind. Indeed, it is incredible that anyone with sufficient legal competence to be engaged by the Department of Justice, let alone an Attorney General, could possibly overlook any such legal possibility, and decide to foreclose the Government definitely from exerting such rights if perchance they were justified by unexpected evidence. What doubtless happened in fact would seem to be, that the former Attorney General, having no personal connection with, or knowledge of, the calling

of the Grand Jury, and merely having had his attention called to the Grand Jury thereafter by those connected with one of the defendants, simply remembered the major purpose that was in the mind of the Department—the defendants' divestiture or dissolution—and completely forgot, after eight years, any allusion to the constantly existing legal tail to the dog.

But, in any event, it would seem immaterial whether this bare legal possibility was alluded to in words to the Attorney General or not. He testified he definitely had it in mind and, if he had it in mind, as far as he was concerned it existed, just as much as it did in the minds of those who put that thought into words. Thus the fact seems clear that all that the entire Department of Justice intended, expected, and desired, when it impanelled the Grand Jury, was to obtain such testimony as would justify the equitable remedy of divestiture or dissolution. Further that, while it recognized that it always had the legal right to seek an indictment, if unexpected testimony rendered same not only feasible from the trial standpoint but practicable from the resultant effect upon the defendants, such an indictment was "at the best highly doubtful," and neither desired, expected, nor intended by the Department of Justice. Therefore, actually the representatives of the Department of Justice "propose[d] to use a Grand Jury for the purpose of gaining evidence * * * [in] a civil suit." Since this is quite clear from the above oral and written evidence—of former Attorney General McGrath himself and from the documents written at the time by his subordinates in the Department of Justice—this fact must be considered settled. This is without even considering the evidence to the same effect of the so-called "withdrawn" affidavit of McGrath and the memorandum of Mr. Royall, upon which the affidavit was partially based, let alone the fact that neither of these documents could be given much weight anyway, since both are of such recent origin, years after the oc-

currences with which they deal, and one of them comes from a source which would naturally have to be considered as biased.

In addition, the testimony of former Attorney General McGrath, as to his intent concerning the use of the Grand Jury, seems to be entirely beside the point for yet another reason. There is no evidence that he knew anything about the impanelling of the Grand Jury when it occurred. Indeed, the first he knew of it appears to be when he was approached by counsel and certain of the officials of one of the defendants, after the Grand Jury had been impanelled and it had subpoenaed literally hundreds of thousands of defendants' documents. Indeed, Mr. McGrath further adds: "The so-called soap case never entered my mind after these conferences."

Nor did the former Attorney General ever personally announce a decision as to the purpose with which the Grand Jury should proceed. When asked if the Department should contain a record of such a decision, had he made one, he said, "It certainly should." But the case is barren of any testimony as to any such decision. Moreover, Morison, the head of the Antitrust Division under McGrath, who was called in by him after the above conferences of defendants' representatives with him, deposes:

> "There were no recommendations made by the Attorney General to me or no orders conveyed from the Attorney General to me as to any disposition of the Grand Jury while he was in office."

Since it is the actual misuse of the Grand Jury which constitutes its subversion, and not simply the undisclosed, and therefore unacted on, intent of the Attorney General in that regard, it is therefore clear that in this peculiar situation, no matter what McGrath's own personal intent was, and whether or not it differed with those of his subordinates (which, as seen above, it did not materially), his undisclosed intent is quite immaterial. This intent, not being dis-

closed, was never carried into effect, as it otherwise and normally would have been, and, at least by it, there was no subversion of the Grand Jury.

The Court feels it should allude to a certain temporary angle of this Grand Jury proceeding, even though the Department of Justice does not allude thereto in its briefs filed on this motion. We must bear in mind that *household* soaps and *industrial* soaps differ substantially in both their production and their distribution, and the civil complaint herein refers to *household* soap and detergents only. The record shows that on February 1, 1952, before any oral testimony had been taken, there was an allusion in a Department of Justice memorandum to "the civil soap case and criminal cases in industrial soaps and glycerine." This consideration of the criminal aspect of a matter, quite different from the civil complaint in this case, had but the shortest life. But a month and a half later, on March 19, 1952, the industrial soap matter was alluded to by the Department of Justice as "general litigation," as to which a civil "complaint" was to be submitted, in the same fashion as the civil complaint which is the basis of the present proceeding as to household soap. There is nothing whatever to indicate that any such criminal aspect of the industrial soap litigation was sought by the Department previously and when the Grand Jury was impanelled. It arose only after the Government had obtained a large number of the defendants' documents but before a single witness had testified. Finally, this industrial soap angle was dropped, criminally at least, almost immediately.

Obviously this angle had nothing to do with the impanelling of the Grand Jury. Obviously it only affected the use of the Grand Jury for the month and a half it was being temporarily considered. When dropped it obviously did not affect the use of the Grand Jury thereafter, i. e., from the very beginning of the oral testimony. Presumably plaintiff's briefs do not allude thereto because the situation, weak as it is, could not possibly have any practical, but only an academic, effect. That is because this temporary consideration of this different criminal aspect could only affect the documents upon which it was based, not the oral testimony which had not then been taken, and these documents are presumably all defendants' documents, as to which all parties are fully advised.

To bolster up their contention that the Department of Justice always intended a criminal outcome of the Grand Jury investigation of the household soap industry, and in entire disregard of the documents to the contrary written by Smith, Kramer and Morison before the Grand Jury was impanelled, plaintiff alludes to the recent oral testimony of Kramer that he and Smith agreed to make no "decision" or "conclusion" not to proceed criminally, until after the great bulk of the witnesses before the Grand Jury had been heard orally. But it is quite clear that this "decision" and "conclusion" referred to a final decision and conclusion, made after the ever present, but unexpected, legal possibility of an indictment had failed to eventuate in fact. Nor does the above show that either Smith or Kramer ever intended, expected or desired that any such indictment would result. In fact their written statements at the time are to the contrary, and, as stated above, it is the Government's intent and desire which is the determining factor. To the same effect is plaintiff's reliance upon the depositions of Morison and Clapp. Their evidence in no way shows that they had an "expectation," to use the plaintiff's term, of a criminal indictment, nor that an indictment was ever "sought." Neither witness testified that the Department was seeking an indictment.

Finally, plaintiff is simply incorrect when it says:

"The determination that the prior criminal case had proved ineffective was based upon the facts developed during the course of the Grand Jury's investigation."

The exact contrary is shown to be the fact by the above mentioned memorandum from Smith to Kramer of March 21, 1951, by the memorandum of Kramer to Morison of March 23, 1951, both of them before the impanelling of the Grand Jury was even authorized, and by the memorandum of Morison to Attorney General McGrath of March 23, 1951, taken in connection with that of Clapp to Attorney General McGranery of November 13, 1952, the latter having been written as the Grand Jury sessions had been almost completed. In them Smith, Kramer and Morison, before the impanelling of the Grand Jury, alluded to the same basis for not considering a criminal remedy effective, as did Clapp in his memorandum to Attorney General McGranery, toward the very end of the Grand Jury sessions. Smith and Kramer, from past experience, stated that they considered a criminal remedy inadequate; they considered "divestiture * * * the only effective relief" against this monopoly. So Morison, on receipt of these recommendations, immediately asked for a Grand Jury to investigate this "monopoly." After almost all the Grand Jury witnesses had been heard, Clapp wrote Attorney General McGranery as to this "monopolization." To remedy this, he advised "only * * * divestitures or dissolutions." The Department's viewpoint that a criminal remedy would be ineffective was the same, both before the Grand Jury had been impanelled and after its sessions had substantially come to an end. Plaintiff's above claim is therefore clearly incorrect.

In conclusion, it thus appears that the situation in regard to the present defendants, as known to the Department of Justice when it called and used the Grand Jury in this case, was not a "case with a criminal cast." It was not one where the criminal "trails" looked "fresh at the start." On the contrary, as those in actual charge of the Grand Jury recommended at the time, mere "injunctions or criminal prosecutions as remedies" were inadequate, and equitable "divesti-ture or dissolution is both necessary and practicable." Again, as Kramer said:

" * * * we propose to use a Grand Jury for the purpose of gaining evidence. If evidence of a law violation is obtained, we propose to file a civil suit * * * the use of a Grand Jury to obtain evidence of a violation of law under these circumstances is entirely appropriate * * * "

Further, the Grand Jury was impanelled for the express purpose of endeavoring to obtain evidence to justify the "divestiture or dissolution" of an apparent "monopoly." As to such monopolies, it was then the policy of the Department of Justice to proceed against them not criminally, but civilly.

Obviously the prosecution was thus "using criminal procedures to elicit evidence in a civil case," to quote from the Supreme Court in its above decision in this case. Hence the United States was, to quote from the same decision, "flouting the policy of the law" and "criminal procedure is subverted." To continue the use of the language of our highest Court, and to apply here the very remedy laid down by our highest Court as appropriate in the present circumstances, the "production of a [the] Grand Jury transcript" [brackets this Court's] to the defendants is "warranted."

■ One of the defendants again urges that because of the above "subversion" of criminal procedure all the Grand Jury testimony, together with all leads obtained by the Government therefrom, be impounded and suppressed. This would, of course, terminate the Government's entire case. It would completely frustrate the intent of the Congress in enacting the Sherman Act. Indeed, this very claim by this very defendant has already been ruled on adversely by this Court, 180 F.Supp. 195 (1959). To repeat the grounds of that decision would obviously be unnecessary and inappropriate. In any event, it is apparent that the defendant's request for impounding

was one which our highest Court clearly had in mind when it decided that the appropriate remedy under such circumstances of misuse was to turn over the Grand Jury testimony to the defendants for their use.

Our highest Court doubtless then had in mind the fact that the Department of Justice thought at that time that it was legally justified in taking the action it did. But if the Department were to repeat such action now, in the face of the above decision of our highest Court that same was illegal, it might well be that a different and more stringent remedy would be considered appropriate.

■ An order to turn over the Grand Jury transcript to the defendants may be presented accordingly.