**122**

UNITED STATES of America,
Plaintiff,

v.

**The PROCTER & GAMBLE COMPANY,**
Colgate-Palmolive Company, Lever Brothers Company, and The Association of American Soap and Glycerine Producers, Inc., Defendants.

**Civ. A. No. 1196-52.**

United States District Court
D. New Jersey.

April 17, 1956.

See also, 19 F.R.D. 149.

Raymond Del Tufo, Jr., U. S. Atty., Newark, N. J., by George J. Rossi, Asst. U. S. Atty., Newark, N. J., Joseph E. McDowell, Atty., Dept. of Justice, Washington, D. C., Raymond M. Carlson, Atty., Dept. of Justice, Chicago, Ill., and Daniel H. Margolis, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

Toner, Crowley, Woelper & Vanderbilt, by John A. Ackerman, Newark, N. J., for defendant Procter & Gamble Co., Dwight, Royall, Harris, Koegel & Caskey, by Kenneth C. Royall, H. Allen Lochner, and Eugene Rossides, New York City, Dinsmore, Shohl, Sawyer & Dinsmore, by Richard W. Barrett, Cincinnati, Ohio, of counsel.

O'Mara, Schumann, Davis & Lynch, by Edward J. O'Mara, Jersey City, N. J., for defendant Colgate-Palmolive Co. Cahill, Gordon, Reindel & Ohl, by Mathias F. Correa and James B. Henry, Jr., New York City, of counsel.

Bailey, Schenck & Bennett, by Alexander T. Schenck, Newark, N. J., Arnold, Fortas & Porter, by Abe Fortas, and William L. McGovern, Washington, D. C., Martin J. Pendergast, General Counsel, Lever Bros. Co., New York City, of counsel, for defendant Lever Bros. Co.

McCarter, English & Studer, by Augustus C. Studer, Jr., Newark, N. J., Davies, Richberg, Tydings, Beebe & Landa, by Adrien F. Busick, Washington, D. C., of counsel, for defendant Association of American Soap & Glycerine Producers, Inc.

MODARELLI, District Judge.

A grand jury sitting in this district from May 1951, until November 25, 1952, investigated possible violations of the anti-trust laws in the soap and synthetic detergent industry. The firms under investigation included the four defendants in this civil action: The Procter & Gamble Company, Colgate-Palmolive Company, Lever Brothers Company, and The Association of American Soap and Glycerine Producers, Inc. No indictment was returned. On December 11, 1952, the United States, filed its complaint in this action.[1]

Now before the court are defendants' motions for an order compelling plaintiff to produce and permit the inspection and copying by the defendants of the transcripts of the testimony of all witnesses who appeared before the grand jury.[2] There are two issues:

■ (1) Whether the ends of justice require the court to exercise its discretion under Fed.Rules Civ.Proc. rule 34, 28 U.S.C.A. to order plaintiff to produce and permit the inspection and copying by the defendants of the transcripts of the testimony of all witnesses who appeared before the grand jury.[3] (2) If the ends of justice require production, whether there is any reason for maintaining the secrecy of the transcripts.

■ The Supreme Court has stated the lofty purpose of discovery which this court has followed[4] and will continue to follow in approaching its consideration of the first issue:

"* * * Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise. * * *" Hickman v. Taylor, 1947, 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451.

The very substantial contention of defendants is that plaintiff has used the facts contained in the transcripts to gain an unfair advantage over defendants who have been unable to use these facts in

1. The action was commenced under § 4 of the Sherman Act, Act of July 2, 1890, c. 647, 26 Stat. 209, as amended, 15 U.S.C.A. § 1 et seq., for alleged violations of § 1 (conspiracy in restraint of trade), and § 2 (conspiracy to monopolize any part of trade) of the Act. In general, the offenses charged are that since 1926 defendants have been engaged in a conspiracy in unreasonable restraint of and to monopolize trade in the production and sale of soap and synthetic detergents, and the three manufacturing defendants have continuously monopolized that trade. Plaintiff asks that defendants be enjoined from continuing their alleged offenses and that each of the manufacturing defendants be dissolved into independent organizations.

2. Alternative motions are for an order compelling plaintiff to produce the transcripts of those witnesses who consent thereto.

3. In United States v. Socony-Vacuum Oil Co., Inc., 1940, 310 U.S. 150, 233, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129, the Court stated: "* * * Grand jury testimony is ordinarily confidential. See Wigmore, supra, § 2362. But after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it. * * *" Rule 34 requires a showing of "good cause" for the production of documents. Surely, if the ends of justice require disclosure of the grand jury testimony, that is good cause for the production of the transcripts.

4. See the description in the Appendix of the unusual procedure used in this case.

preparing for trial. They argue that justice, as implemented by the broad discovery rules,[5] entitles them to use these transcripts. As a result of that persuasive contention and because this is a "Big Case" [6] involving serious, complex, and unique procedural problems, during the oral argument of these motions the court asked Mr. McDowell, plaintiff's attorney, the following questions:

"Mr. McDowell, do you object to submitting a detailed affidavit stating exactly (a) what use, if any, plaintiff has made in the past of the grand jury transcripts while preparing for the trial of this case; (b) what use, if any, plaintiff intends to make of the transcripts during its future preparation for the trial; (c) what use, if any, plaintiff intends to make of the transcripts during the trial." (Transcript, December 12, 1955, pp. 6–7.)

He wished to confer with his superiors in the Department of Justice before deciding if he would answer the questions.

The court awaited candid answers—but in vain. For Mr. McDowell wrote:

"The questions which you put to me at the hearing on December 12th relating to the use by the government of transcripts of grand jury testimony have been given serious consideration within the Department of Justice. I am instructed respectfully to inform you that we do not wish to add to the statement which I made at the hearing."

His "statement" at the hearing did not answer the questions. Because the plaintiff arbitrarily has refused to answer the court's questions relating to any use of these transcripts, the court has been denied helpful information and as a result has been forced to seek its answers elsewhere.

The Department of Justice, plaintiff's representative in the courts, believes that under the law it has the right and duty to use the grand jury to enforce the antitrust laws through criminal proceedings, civil actions, or both.[7] This is plaintiff's policy, and although its legality is not

---

5. See Rules 26 to 37. And Rule 1 requires this court to construe the Rules " * * * to secure the just, speedy, and inexpensive determination of every action."

6. The label now is synonymous with Sherman Act cases commenced by the United States against multiple defendants. See "The Big Case," 64 Harv.L.Rev. 27 (1950). The magnitude of this case is described in the Appendix.

7. See discussion at pp. 3–4 of the appendix [19 F.R.D. 130]. Additional evidence of the Department's interpretation of the law is a statement by the Assistant Attorney General in charge of the Antitrust Division of the Department: On May 12, 1955, he appeared before the Special Antitrust Subcommittee of the Judiciary Committee of the House of Representatives; he stated:

"Finally, I suggest you may wish to consider means available to the Department for compelling production of data before a complaint has been filed in a civil procedure. At the present time in the investigation of civil matters, the Department must

"(a) depend upon the voluntary cooperation of those under investigation;

"(b) file a civil complaint and make use of discovery processes under the Federal Rules of Civil Procedure; or

"(c) make use of the grand jury.

"Those are alternatives.

"From this it seems clear that the sole means for compelling pre-complaint data in civil cases is the grand jury. Some— and I refer to lawyers there primarily— have urged that such use of the grand jury constitutes an abuse of its processes.

"Mr. Maletz. Do you agree with that position, Judge?

"Mr. Barnes. I do not.

"The Chairman. I am glad to hear you say that.

 * * * * *

"Mr. Harkins. In that connection, under the Sherman Act, you can use a grand jury to get evidence solely for a Section 4 injunction proceeding, can you not? There is no abuse of using the court's process to convene a grand jury to secure evidence for you solely in a Section 4 proceeding?

"Mr. Barnes. No, I do not think there is any abuse of it." (The colloquy

now in issue, was it followed during the grand jury investigation of these defendants?[8] On the day the complaint was filed, the Department issued its usual press release, which included the news that "The filing of the complaint results from a careful and thorough investigation of the industry, including extensive grand jury proceedings." There was a basis for that statement. An affidavit filed by Mr. McDowell in support of certain omnibus motions under Rule 34[9] indicates that the plaintiff considered its motions as requests for supplementary discovery to add to information previously obtained both from documents and testimony during the grand jury proceedings. Additionally, a previous opinion in this case is pertinent:

> " * * * Government's counsel stated in affidavit form that the purposes of the investigation were, first, determination whether there were violations of Sections 1, 2 and 3 of the Sherman Act, 15 U.S.C.A. §§ 1–3, or any of them, or of any other Federal anti-trust laws, and, second, determination as to what action should be taken to enforce those laws through criminal proceedings, civil proceedings or both. He further stated that the investigation and all proceedings incident to it, including the grand jury proceeding, were begun and carried on pursuant to and within instructions to accomplish those purposes. * * *" United States v. Procter & Gamble, D.C. N.J.1953, 14 F.R.D. 230, 233.

The evidence before the grand jury, of course, consisted both of documents and testimony, whereas the motions now before the court relate only to the testimony. But none of the evidence as to plaintiff's policy and use of the transcripts indicates that plaintiff is disregarding grand jury testimony.

The court is not completely informed about plaintiff's use of the transcripts, however, because plaintiff's silence as to the extent of its use is not overcome by any evidence similar to that which has enabled the court to decide that plaintiff has used and will continue to use the transcripts during its preparation for trial. As to what use plaintiff plans for the transcripts during the trial itself— subject to the law of evidence—although the court once again is confronted by the lack of answers to its questions, since the case only is in its discovery stage the issues involved are not now before the court.[10]

The fact that plaintiff has used and will continue to use the transcripts while preparing for trial is perhaps sufficient reason why the ends of justice require production of the transcripts for defendants' use. But equally important is the extent to which defendants will be aided by such production. The testimony contained in the transcripts is unknown to the court. But plaintiff has never contended it is irrelevant to the issues in this case. Indeed, such a contention would be disingenuous in view of the fact of plaintiff's use of the transcripts. Any relevant information, not privileged,

appears in Colgate's Brief, pp. 13–14; its source is the transcript published by the Bureau of National Affairs, Inc., at p. 350.)

8. If the policy was followed, it is reasonable to conclude that plaintiff has used and will continue to use the transcripts during its preparation for trial; the only other conclusion would be that plaintiff has adopted a useless policy. Furthermore, would plaintiff so vigorously have argued the legality of its multiple use of the grand jury unless in this case it had used the transcripts?

9. See discussion in the Appendix beginning at p. 7 [19 F.R.D. 132].

10. During the trial of United States v. Ben Grunstein & Sons Company, D.C. N.J.1955, 137 F.Supp. 197, 203, a civil action, an opinion was filed ordering plaintiff to produce the transcripts of the grand jury testimony of " * * * (1) the defendants, who represent that they will take the stand in their own defense, and of (2) any other witnesses before such Grand Jury, who will definitely take the stand at this trial, as soon as such fact definitely appears."

which is the scope of the pretrial discovery mechanism established by Rules 26 to 37, has "* * * a vital role in the preparation for trial. The various instruments of discovery now serve (1) as a device, along with the pre-trial hearing under Rule 16, to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial." Hickman v. Taylor, 1947, 329 U.S. 495, 501, 167 S.Ct. 385, 388, 91 L.Ed. 451. Thus, the transcripts would be useful to defendants during their preparation for trial.

Clearly, the ends of justice will be attained by plaintiff's disclosure of the grand jury testimony, and defendants have shown good cause for the production of the transcripts. But, plaintiff argues, if defendants inspect and copy the transcripts, it would violate their traditional secrecy.

Any discussion relating to the secrecy of grand jury transcripts begins with United States v. Rose, 3 Cir., 1954, 215 F.2d 617. There the court summarized, at page 628, the reasons generally given for the rule of secrecy:

"* * * (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."

■ Do any of those reasons apply in this case? The grand jury having been discharged without returning an indictment, (1) and (2) clearly do not apply; (5) also is not applicable for the very corporations who were being investigated have moved for production of the transcripts. As to (3), the court agrees with Judge Hartshorne's opinion in United States v. Ben Grunstein & Sons Company, supra, 137 F.Supp. at page 201:

"* * * this same reason applies to every possible witness known to one party in a civil proceeding, whose name is desired by the other, a form of discovery clearly requisite. For the Federal Rules of Civil Procedure are based on the conclusion, that this possibility is not as great a danger as is the danger of surprise, which habitually resulted previously, when such discovery was generally refused. That this conclusion is sound, is fortified by the fact that the party who already knows of this witness can, by these very same discovery rules, see that this witness' story is not tampered with, by having his depositions taken and sworn to, before he is subjected to any such possible pressure from the other side."

As to (4), United States v. Socony-Vacuum Oil Co., Inc., supra, United States v. Ben Grunstein & Sons Company, supra, and 8 Wigmore, Evidence, § 2362 (3d ed. 1940) are persuasive authorities that after the grand jury has been discharged, the temporary guarantee of secrecy ends and disclosure is proper. If the rule were otherwise, it would create an opportunity for abuse by a corrupt witness who could testify falsely without fear of his lies being revealed to public scrutiny and reaction.

Thus, none of the reasons for secrecy of the transcripts applies in this case.

The court indicated during the oral argument that the many criminal cases cited by plaintiff which involved special circumstances for maintaining secrecy properly were distinguishable from this case. Subsequently, United States v. Ben Grunstein & Sons Company, supra, was decided, wherein the court also distinguished the cases where the defendants sought production of the transcripts in order to attack the validity of the indictment.[11] The defendants in this civil action seek the transcripts for discovery purposes.

Judge Learned Hand's remark in United States v. Garsson, D.C.S.D.N.Y.1923, 291 F. 646, 649, is often quoted:

"* * * no judge of this court has granted it [motion for inspection of the grand jury minutes], and I hope none ever will. * * *."

It was a criminal case in which defendants moved to quash the indictment and at the same time they moved to inspect the grand jury minutes. In his opinion, Judge Hand first denied the motion to quash, then he denied the motion to inspect. The full text of the portion of the opinion relating to the motion to inspect clearly shows that his remark cannot be applied in this case.[12] United States v. Morgan, D.C.S.D.N.Y., 118 F. Supp. 621, also is not persuasive authority for there was no opinion setting forth the court's reasons for denying the defendants' motion for production of the grand jury transcripts; moreover, the court in that case orally admitted that perhaps "* * * I have been unduly affected by that statement of Judge Learned Hand. * * *."[13]

In United States v. General Motors Corp., D.C.Del.1954, 15 F.R.D. 486, 487, 488, the court denied the defendant's motion under Rule 34 for production of the grand jury transcripts. The court having found no reported case in which a defendant requested in a civil action production of the transcripts under Rule 34, it decided the question "* * * on general principles of long standing, designed to protect and preserve the efficacy of our Grand Jury system." One of the general principles which the court relied upon was that although discovery

11. Shushan v. United States, 5 Cir., 1941, 117 F.2d 110, 133 A.L.R. 1040; United States v. Papaioanu. D.C.Del.1950, 10 F.R.D. 517; United States v. Oley, D.C. E.D.N.Y.1937, 21 F.Supp. 281; United States v. Herzig, D.C.S.D.N.Y.1928, 26 F. 2d 487; United States v. Morse, D.C.S.D. N.Y.1922, 292 F. 273; United States v. Silverthorne, D.C.W.D.N.Y.1920, 265 F. 853; United States v. Gouled, D.C.S.D. N.Y.1918, 253 F. 242; United States v. Rubin, D.C.Conn.1914, 214 F. 507; United States v. Violon, C.C.S.D.N.Y. 1909, 173 F. 501.

12. "Finally, the defendants, recognizing that it is difficult to make a case for quashal by the scraps of evidence accessible, move for inspection of the grand jury's minutes. I am no more disposed to grant it than I was in 1909. United States v. Violon, C.C., 173 F. 501. It is said to lie in discretion, and perhaps it does, but no judge of this court has granted it, and I hope none ever will. Under our criminal procedure the accused has every advantage. While the prosecution is held rigidly to the charge, he need not disclose the barest outline of his defense. He is immune from question or comment on his silence; he cannot be convicted when there is the least fair doubt in the minds of any one of the twelve. Why in addition he should in advance have the whole evidence against him to pick over at his leisure, and make his defense fairly or foully, I have never been able to see. No doubt grand juries err and indictments are calamities to honest men, but we must work with human beings and we can correct such errors only at too large a price. Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime."

13. Transcript of Hearing filed December 31, 1948, p. 192.

under the Rules is of extensive scope, it " * * * must be halted when it attempts to invade ground reserved for loftier reasons than thoroughness of preparing one's case on the civil side of the court. * * * " The court decided that protection of the grand jury process was a loftier reason: " * * * The effect on subsequent proceedings, on jurors, on witnesses, on the privacy of the system itself, is of greater moment * * * ." This court will not follow that decision, and for two reasons, viz., the opinion does not indicate that the court considered whether plaintiff used the grand jury transcripts in connection with the civil action; and that court mainly relied upon criminal cases wherein the refusal to order production of the transcripts was for reasons not present in this case.

 The question to be resolved here by the four motions presents an unprecedented vexing problem, since practically all cases dealing with the subject matter concern cases decided under Rule 6(e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. Here, the applications to inspect and copy the grand jury transcripts are brought under the discovery provisions of the Federal Rules of Civil Procedure. I realize there is a strong caveat against the needless intrusion upon the indispensable secrecy of grand jury proceedings. The reasons therefor were indelibly impressed upon me when I served as Assistant Prosecutor of my home county for ten years where I spent the greater part of the time presenting cases to the grand jury. I realize further that a strong and positive showing should be required of persons seeking to break the seal of secrecy, which never should be done except in extreme instances to prevent clear injustice or an abuse of judicial processes. Which policy should be served here to bring about justice—the policy requiring secrecy, or the policy permitting disclosure for discovery purposes only in the interest of justice? I believe the requirement of secrecy in this case can be

safely waived and the minutes of the grand jury divulged within the limits prescribed by the law, and that the failure to do so would be an abuse of discretion and not in the furtherance of justice. Under Rule 6(e) of the Federal Rules of Criminal Procedure our courts have, by way of interpretation, extended their jurisdiction so as to remove "the veil of secrecy" around grand jury proceedings where, in the court's discretion, the furtherance of justice requires it. If it can be done on the criminal side, I can see no compelling reason why it cannot be safely done on the civil side in this case. I would not grant these motions if I thought they were prejudicial to the public interest, useless or unnecessary, would not reveal the information sought, or defendants already possessed all the necessary information or could obtain it by pursuing a different remedy. These motions were considered by me objectively and honestly by setting aside all my preconceived ideas on the subject.

The court concludes that since plaintiff is using the transcripts containing relevant information, the ends of justice require the court to order plaintiff to produce and permit the inspection and copying by defendants of the transcripts; equal use of the transcripts by defendants will give them the fullest possible knowledge of the facts before trial; none of the reasons for the rule of secrecy applies.

An order may be submitted in conformity with the opinion herein expressed.

### Appendix

In its opinion granting the defendants' motions to compel the plaintiff to produce the grand jury transcripts, the court referred to the serious, complex, and unique procedural problems involved in this case. A discussion of those problems will show their relationship to defendants' motions as well as explain the references in the opinion to other phases of this case. Also, judges and lawyers who in future years will be involved in protracted anti-trust cases—a "Big

Case"—will be aided by a description of the unusual procedure successfully used in this case during the normally gruelling Battle for Documents.

When the plaintiff filed three omnibus motions under Rule 34, designating by category descriptions the types of documents sought from the three manufacturing defendants, the court studied the lengthy descriptions. It would have been impossible to decide intelligently the issue, viz., whether plaintiff's assertion of "good cause" for the production of the documents was outweighed by defendants' assertion that additional production would force them to undergo an unreasonably disruptive and expensive file search. The court also was greatly concerned about plaintiff's failure to reveal sufficient relevant facts which it had discovered from defendants' earlier production of documents. By suggesting a procedure the court hopefully anticipated that if plaintiff would reveal its facts defendants would consent to produce some documents, thereby limiting plaintiff's requests for documents in a greatly modified substitute motion. Happily, to date it appears that plaintiff's motions are or will be entirely unnecessary.[1]

A detailed discussion of most of the litigation events which have occurred in this case is required to understand counsels' arguments as well as the court's solution of the serious and recurrent problem concerning the production of documents in a protracted anti-trust case.

March 6, 1953, plaintiff filed the first motion. It was for an order requiring defendant Procter to produce documents under Rule 34, " * * * and permit the plaintiff to inspect and remove from the custody of the Clerk for the purpose of copying * * * certain documents identified by numbers affixed thereto by defendant, such numbers being listed in Exhibit 'A' attached hereto. * * *." The documents were designated by numbers assigned by Procter prior to the production of the same documents in compliance with three grand jury subpoenas.[2] Since the documents had been returned to Procter, plaintiff's motion was a necessary procedural move. In opposition to the motion, Procter's principal arguments were that plaintiff failed to show the good cause required by Rule 34, and that plaintiff had abused the process of this court. The substance of the first argument was that " * * * since plaintiff has had possession of the great bulk of Procter documents now asked for a year and a half and has made copies and notes, though improperly, of selected papers, it would seem obvious that plaintiff is already in possession of the information sought and has no cause for production under Rule 34." As to

---

1. April 19, 1955, was the happy day on which all counsel appeared in court and presented consent orders covering all of the Rule 34 motion, except documents relating to market position. Counsels' comments regarding the effectiveness of the procedure which resulted in the consent orders encouraged the court to write this description. For example, Mr. Kramer, counsel for plaintiff, said: " * * * your honor came up with not only a highly ingenious suggestion for cutting the Gordian knot of the battle of the papers, but also the suggestions proved to have been quite fruitful, I think, from the Court's point of view and, I am sure, from that of all the parties. Every one has had to give up something, but in the process I am sure that the Government has learned a great deal about its case, and about the way in which to operate cases of this size. * * *." Mr. Royall, counsel for Procter, agreed with Kramer " * * * as to the benefit that every one has derived from the procedures which your Honor suggested. * * *." Mr. Fortas, counsel for Lever, expressed " * * * my appreciation, as a member of the Bar and as one of the counsel in this case, to your Honor for devising this procedure, which I believe has worked out very satisfactorily, thanks to your Honor's order and to the cooperation among all counsel. I believe that the years to come may show that this has been a significant contribution to antitrust procedure."

2. Two subpoenas were served in May, 1951, and one in June, 1952. Motions to

the second argument, "* * * the Government abused the process of the Court by using criminal subpoenas before a Grand Jury in order to prepare for this civil action. * * * Accordingly, this Court should redress the wrongs done to Procter by reason of the abuse described and, by dismissing this motion, should see to it that the Department of Justice in this case and in future cases will take no benefit at all from misusing the Grand Jury process."[3] A further argument was that since proceedings before the grand jury are ex parte, the effect of plaintiff's conduct is that in this civil case plaintiff has obtained ex parte discovery contrary to the mutuality nature of the pretrial discovery rules. In support of its motion to produce documents, plaintiff argued that "* * * Defendant cannot say that the documents which it was ordered to produce [by Judge Forman during the grand jury investigation] because of their relevance to the descriptions of violations made in the argument [before Judge Forman] are not equally relevant to the allegations of the complaint. Neither can it say that documents which were needed to determine the existence of such possible violations are not now needed to establish the allegations in the complaint." As to Procter's argument regarding the misuse of the grand jury process, according to plaintiff "* * * the investigation [grand jury] was begun and carried on with both criminal enforcement and civil enforcement in mind. The purposes of the investigation were, first, determina-

tion whether there were violations of Sections 1, 2 and 3 of the Sherman Act or any of them, or of any other Federal antitrust laws, and, second, determination as to what action should be taken to enforce those laws through criminal proceedings, civil proceedings or both. * * * Because the Sherman Act's Section 4 by virtue of which civil actions may be brought, is an ancillary section, dependent, as Judge Carpenter stated * * *, [United States v. Swift, D.C. Ill.1911, 188 F. 92, 96] upon the criminal sections, it is difficult to see how any investigation could ever be begun with the sole purpose of bringing a civil case."[4] Plaintiff believed that a Section 4 action could not be commenced until a determination had been made that there had been a violation of the criminal sections, that whatever other action is taken by the Department of Justice, the preliminary determination must be that there has been a violation of the criminal sections of the Sherman Act.[5]

May 11, 1953, this court filed its opinion granting the motion, United States v. Procter & Gamble, 14 F.R.D. 230, 232, deciding that plaintiff properly sought production of the documents "* * * anew in this cause to avoid the objections voiced by defendant's attorney, rather than depend upon the previous possession in the criminal action."[6] As to the abuse of process argument, this court was unwilling "* * * to criticize this procedure [the multiple purpose—criminal, civil, or both—use of the grand jury] by a refusal to allow production

quash the former were extensively argued before Judge Forman, who modified their scope.

3. According to Procter, plaintiff's use of the grand jury subpoena to obtain facts upon which to base a civil complaint was an abuse of process which can be prevented only by denying plaintiff a second look at the documents.

4. Plaintiff also argued that since the dependency of § 4 upon §§ 1, 2 and 3 requires a determination as to whether there has been a criminal violation before a civil action can be commenced under §

4, it would not be an abuse of process to undertake grand jury proceedings with the sole purpose of preparing for a civil case under § 4.

5. "* * * It [United States] couldn't bring a Section 4, Sherman Act civil case unless it had determined to its satisfaction that there had been violations of the criminal portions of the law."

6. Mr. Royall, Procter's attorney, had vigorously argued that during the criminal proceedings the documents were illegally obtained, thus they could not be used or ordered produced in this civil action.

of the documents requested." As a result of the skirmish between plaintiff and Procter culminating in this court's order to produce the documents, on plaintiff's application on July 14, 1953, this court also ordered the other three defendants to produce certain enumerated and described documents " * * * the United States desiring these documents [the same as those produced before the grand jury] for use in the present action as though they had been produced by Lever [and Colgate and The Association] pursuant to motion and order under Rule 34 * * *." On the same day there was a stipulation for inspection and copying by defendants of certain "third person" documents. The defendants had sought permission from plaintiff to inspect and copy documents possessed by plaintiff's attorneys for use in trial preparation and which were obtained from and were records of persons, firms or corporations who are not parties in this action ("third persons"); the stipulation resulted when thirty-seven of the third persons did not object to defendants' inspecting and copying the documents.

June 4, 1953, Procter filed two motions: For the "Return of Copies and Other Writings" [7] and to "Suppress Certain Documents." [8] One of Procter's two principal contentions in support of its first motion was its previous contention relating to the abuse of grand jury process. Procter also contended that " * * * Judge Forman, during the hearings on the motions to quash the said subpoenas duces tecum, ruled that the documents to be submitted should be retained in rooms provided in the Federal Building, Newark, New Jersey, and counsel for the Government acquiesced. Nevertheless, in violation of this ruling, as we contend, counsel for the Government caused copies and notes, etc., of certain of the said documents to be made and to be taken to Washington, D. C., where they would normally have been handled or seen by persons not directly concerned with the Grand Jury proceedings." [9] Procter's contentions in support of its second motion included all of its previously discussed arguments regarding plaintiff's motion for the production of documents.[10]

January 14, 1954, this court denied Procter's two motions. Absent any authority, the court was reluctant to erect an " * * * insurmountable obstacle to any civil action * * *," which probably would have resulted if the motion had been granted.[11]

---

**7.** Copies of the documents; excerpts from and all notes, analyses, summaries and other writings concerning the documents.

**8.** (1) Documents submitted by Procter to the grand jury and listed in plaintiff's motion dated March 6, 1953; (2) copies of, excerpts from and all notes, analyses, summaries and other writings concerning any of the documents; papers, documents and other like evidence obtained directly or indirectly by reason of information or knowledge derived wholly or partially from (1) and (2). Procter also included in the motion any documents, etc., obtained by plaintiff during the grand jury proceedings from any of the other defendants, and any documents, etc., obtained from any source other than defendants.

**9.** Royall's affidavit dated June 4, 1953, p. 2.

**10.** The only effective remedy, argued Proc-

ter, for plaintiff's conduct is to prohibit plaintiff's use of the documents. Plaintiff again argued: " * * * Section 4 of the Sherman Act, the section under which the instant civil action was brought, is simply an ancillary provision to Sections 1, 2 and 3 which establish and define crimes. *The civil action may be brought only 'to prevent and restrain violations' of the Act's criminal provisions.* (15 U.S.C.A. § 4). * * *."

**11.** " * * * the proper remedy is not the granting of this type of motion, which would probably result in an insurmountable obstacle to any civil action, but by a direct attack at the outset of the criminal investigation. Indirect deterrence does not outweigh enforcement of the antitrust laws. If the court were to grant these motions, would it not, in effect, forever bar a civil action? And would not the principle of law be that where documents are produced by a party pursuant to a

August 23, 1954, plaintiff filed the three omnibus motions under Rule 34 for production of documents by the three manufacturing defendants, and on September 24, 1954, amendments were filed. Two of the three motions were eleven pages in length, one was ten pages. For example, plaintiff demanded the following categories of documents from Procter: Profit and loss statements and balance sheets; records or work books showing monthly estimates of departmental expenses and profits and losses; published price lists; sales records; records or work books showing prices, various costs and profits; market surveys, charts, tables and schedules, memoranda and correspondence showing production, sales, purchases, promotional expenditures, inventories, prices, costs, profits; licenses, sub-licenses or other contracts concerning patents; memoranda or correspondence relating to certain patents, negotiations for the procurement of certain materials, construction of facilities by the supplier of certain materials, processing of certain materials; with respect to the production of synthetic detergents, production schedules and estimates, analyses and estimates of base material requirements, sales estimates, and plans, and all memoranda and correspondence relating thereto; contracts with sellers of certain products; memoranda and correspondence relating to price changes and other price data; market surveys, tabulations, memoranda and correspondence relating to shelf prices charged by retailers; records and contracts relating to purchases of tallow or grease during certain periods; memoranda and correspondence relating to purchases of tallow or grease; memoranda and correspondence relating to the termination of the "official New York market price" for tallow or grease, and to the criteria in determining their price; tri-party contract establishing brand quotas or other limitations on advertising and promotional expenses entered into by Procter, Colgate, and Lever in or about January 1938, and all reports, memoranda and correspondence relating thereto; records showing total advertising expenditures and brands sales promotion for each brand; sales division expenses records; memoranda and correspondence relating to the discontinuance or limitation by the three manufacturing defendants and/or any other manufacturer of 1¢ or other special sales, special factory packs, premiums, or special advertising allowances; competitive activity reports; promotional records of various sales units; market surveys, tabulations, charts, memoranda and correspondence relating to the planning and conduct of certain promotional couponing campaigns; records showing sales by product categories as reported to the defendant Association; records showing sales and shipments by product categories as submitted to the Bureau of Census of the United States Department of Commerce; records showing sales by brands; records showing sales of various products by dollar amounts; records showing sales of glycerine; memoranda, correspondence, and reports relating to comparative washing tests and detergent evaluations of any brands of other companies; memoranda and correspondence relating to negotiations for the purchase of rights to the product "Glim" from the General Aniline & Film Corporation.

Defendants' lengthy briefs and affidavits in opposition to the three motions greatly interested the court in the pro-

subpoena duces tecum for consideration by a grand jury and thereafter the documents returned, no indictment having been found, as was the case here, and subsequently a civil action is commenced by the United States against the same party and the same documents are produced pursuant to Rule 34, that neverthe-

less the United States must deliver to that party its 'work product' based on the documents and all evidence therefrom must be suppressed. There is no authority or precedent for such a proposition, nor does this court believe that should be the law." 19 F.R.D. pages 149 and 150.

cedural problems of a "Big Case."[12] The court's research and its own ideas resulted in a suggested procedure which was read to counsel during the oral argument:

"Of course, I am happy to note that both sides agree with my opening remarks in an attempt to focus the problem of revealing more specifically the facts upon which the Government bases its case.[13] I have some suggestions. If you will bear with me, it may be productive of some good. I hope it will be. So far we have gotten off to a pretty good start and there is indication of a spirit of cooperation.

"Now, I have a suggested manner of procedure. I thought I would give it to you before lunchtime so you gentlemen can think it over and see whether or not you think this is as good as I think it is. I will concede that many of you attorneys in this case know more about antitrust litigation than the Court will ever know.

"I will, of course, limit discovery to documents which are relevant to the issues in the case. That's difficult because we don't have the issues yet.

"The pleadings have not particularized the issue. Thus it is the job of the Court and counsel to do it as soon as possible.

"The parties should agree upon a statement of the issues, but if that is impossible they may submit to the Court their proposed statements, which will always be subject to any necessary amendments.

"When the issues have been defined, the plaintiff, in accordance with Mr. Barnes' promise, should relate to the issues and specify the documents it intends to rely upon to prove those issues.

"As to the period of time for which discovery will be allowed at this time, no document relating to conduct later than December 11, 1952, I believe, should be produced— December 11, 1952.[14] Any conduct of the defendants subsequent to that date, on which the complaint was filed, may be relevant to the problem of the remedy, if the defendants are liable, but such post-complaint conduct is not relevant to the liability phase of this case, in the Court's opinion.

"Plaintiff has complained of an alleged condition existing prior to that date, a combination-conspiracy-monopolizing brought about by an alleged course of conduct occurring prior to that date. By its very con-

12. For example, Mr. Siddall of Procter swore that his company already had produced twenty-two full filing cabinet drawers, containing in excess of 50,000 pieces of paper, books, and other corporate records; he estimated that thus far the cost involved in the search of files exceeded $175,000, exclusive of all legal expenses and that the search would require the full or part time services of more than 100 employees of the company for a substantial period of time and the direct and indirect expense to the company, apart from the interference with the normal conduct of its business, would be $60,000. Mr. Pollock of Colgate swore that production of documents under six paragraphs alone would exceed the total production of 45,000 pages under the three grand jury subpoenas. Mr. Kissner of Lever swore that the mo-

tion, if granted, would require Lever to examine 200 file drawers and 1,200,000 papers, and two paragraphs of the motion would require it to produce 300,000 documents.

13. The court's opening remarks were, in part, prompted by Judge Prettyman's comments at the Symposium of the New York State Bar Association Section on Antitrust Law, held on January 24, 1951: " * * * a trial is for the determination of issues; issues are disputes; a dispute must concern a known subject; to be justiciable, the positions of the parties upon the subject must be known; to be persuasive, evidence must be understandable and definitive."

14. Plaintiff later consented to limit its motions for discovery to documents pre-dating the complaint.

tents a complaint of this sort looks to the past, complains of the past, and says because of the past, laws have been violated.

"Since the complaint alleges a conspiracy and a monopolization, however, as a matter of substantive law at the trial it may be necessary for the court to consider the impact of the defendants' conduct upon actual or potential competition. And if that is the case, perhaps evidence of competitive activity, or the lack of it, would be significant. 65 Harvard Law Review, 1079.

"As to plaintiff's desire to search into antiquity, since plaintiff has alleged that defendants have formed a combination and conspiracy, proof of it is, of course, essential to the plaintiff's case, so that documents, however ancient, relating to the alleged formation, are properly within the scope of the case. The rub here, however, is in the breadth of the word 'relating', which always causes a great deal of trouble, there being no document labeled 'Combination and Conspiracy Agreement.' But conduct alleged to have been pursuant to the alleged combination and conspiracy may have occurred so many years ago that proof of it will not aid the Court in deciding whether or not any unlawful results have occurred. The distinction here is between evidence of conspiracy and evidence of conspiratorial conduct, the latter presenting the familiar quantitative problems of cumulative evidence and bulk, which counsel must earnestly strive to limit, both for the benefit of the Court and their clients.

"The test for each category of documents sought is, of course, relevancy. But in this case we should add the words 'and necessity.' Plaintiff must show not only that it needs the documents for purposes of its trial preparation, but also that it needs them at this time. Has plain-

tiff completed its analysis of documents previously produced?

\* \* \* \* \* \*

"Furthermore, it appears that at least one discovery order has not yet been fully complied with. According to the brief of Lever Brothers, 'The parties have been and currently are engaged in carrying out' a discovery order entered on July 14, 1953, pursuant to which Lever Brothers transmitted documents to the plaintiff as late as September 28, 1954. Since documents were produced only two weeks ago, plaintiff must show not only that the documents designated in the current motion are relevant to the issues, but are needed at this time by the plaintiff's attorneys. Is their work schedule so arranged that they will be able to examine these documents at this time or in the foreseeable future?

\* \* \* \* \* \*

"The Court hereby sets forth some ideas for keeping this case within reasonable, workable bounds, if that can be done in an antitrust case: (1) It is absolutely necessary to eliminate from plaintiff's discovery efforts any documents which are cumulative, repetitive, and in the nature of housekeeping papers. (2) One method by which the volume of documents might be reduced would be for the defendants to produce samples or statistics for representative years, then after analysis, plaintiff, if it desired to rely upon those samplings, would stipulate with defendants that it is a sample which is representative, if, in fact, such is the case. Or the Court could order production of the sampled documents upon plaintiff's showing of necessity. (3) In order to create issues of fact, obviously plaintiff must reveal more facts. For example, the complaint alleges that defendants have attained, maintained, augmented, and exploited dominance

over all others purchasing and selling principal materials used in the production of synthetic detergents. To such allegations of conclusions we must apply questions—How, when and by whom was it done? How did defendants achieve their alleged dominance? 'By mergers and acquisitions,' alleges the plaintiff. To which may be asked the question: When and by whom?

"Or, plaintiff alleges, 'It was done by controlling, fixing, regulating and manipulating prices, terms and conditions of sales, and promotional activities,' as to which the natural question might be: How? Plaintiff alleges, 'By exchanging information.' But it may be asked: When?

"Frankly, plaintiff should state the evidence upon which it intends to rely. Perhaps this could be done by answers to interrogatories pursuant to Rule 33 * * *.

"(4) The parties should enter into stipulations as to undisputed facts or facts not subject to justifiable dispute. Rule 36 pertaining to admissions might be usefully employed here.

"(5) Defendants might produce summaries of documents, keeping the originals readily accessible upon demand. * * *" (Transcript, pp. 41–46.)

Plaintiff not only "* * * welcome[d] your Honor's indication that you do not consider the material relating to the post-complaint matters as being relevant to these issues. I think that in itself will help a great deal." but also stated that it was willing to modify its lengthy motions.[15] Since the court's many oral suggestions required careful analysis by and conferences among all counsel, there was an adjournment of further argument on plaintiff's three motions.

October 22, 1954, the court in a letter to counsel made suggestions to guide them for the next hearing:

"Plaintiff requires documents to properly prepare its case. Since plaintiff's motion for discovery under Rule 34 is before the court, the designation of documents therein will be our guidepost. I was persuaded during plaintiff's argument at the hearing on October 14, 1954, of the great physical and financial burden to the defendants involved in producing the requested documents, so that now we should concentrate on the significance of the documents. There should be a showing by the plaintiff that its work schedule will enable its attorneys to use the documents, especially since it appears that some documents are currently being produced pursuant to prior discovery orders and agreements, which have not been examined yet by the plaintiff.

"Prior to hearing argument on the motion, the court will hear counsel on the following matters:

"1. A proposed modus operandi worked out by both sides, including a tentative time-table for production of documents and for pretrial conferences.

"2. Can counsel agree upon a statement of the issues?

"3. It appears that when plaintiff is ready to reveal more facts upon which it will rely, then defendants will not object to producing documents pertaining thereto. At this time, is it unreasonable to ask plaintiff what facts it has determined from the many documents already produced? Is the case ripe for a statement of facts by plaintiff? If not, when?

"4. Since plaintiff welcomed the court's discovery limitation (transcript p. 52) and said that it will

---

15. Properly, counsel for Lever was greatly disturbed at such an indication of

plaintiff's "undigested requests" for documents. (Transcript, p. 56.)

voluntarily withdraw and limit certain portions of its motion, is it prepared to do so? If so, how?

"5. If counsel have not agreed as to the cut-off date limiting plaintiff's period of inquiry, I shall hear argument thereupon.

"6. Assuming plaintiff does not seek 'housekeeping' documents, plaintiff should define the word.

"7. Have counsel agreed to the production of sample documents, statistics, and summaries?

"8. Have counsel agreed whether documents relating to industrial products are relevant?

"9. Are not the words 'relating,' 'concerning,' 'referring to,' 'showing,' which are used throughout the motion papers properly subject to at least two interpretations, viz., the document is sought if (a) within its four corners it evidences the designated subject, or (b) there is a relationship between the document and the designated subject. Which interpretation is intended by plaintiff?

"10. Have counsel entered into any stipulations of fact?

"While I encourage counsel to take positions on many points, no one should fear that subsequently he will not be permitted to modify them. In our 'Big Case' there will be no arbitrary rules binding the parties to any positions taken up to keep the case in manageable shape.

"Finally, defendants have emphasized their need for plaintiff to reveal the documents and facts upon which it will rely, relating them to the issues. The argument appears valid in that unnecessary trial adjournments on the grounds of surprise might thereby be avoided. But do the defendants need such information at this stage of the case? If and when the need is shown, will plaintiff be ready to comply?"

The hearing was set for December 7, 1954. Meantime, all counsel had conferred five times and had submitted reports to the court. As a result, the court was able to determine the remaining areas of contention regarding the still pending plaintiff's motions for the production of documents. Again, the court's opening oral remarks at the hearing describe its approach:

"Now, at the outset I should like to commend and thank counsel who have submitted to the Court their reports of the five meetings held since the October 14, 1954 hearing in this courtroom. While there is no verbatim transcript, after reading the reports the Court has been able to determine some of the areas of contention and differences of opinion.

"Also, I am extremely pleased that five meetings have been held. Although all problems have not been solved, which was my fervent hope, I believe that we are on our way toward keeping this case in manageable shape. While you have not agreed on voluntary production—except that defendants will bring up to the date of the complaint the documents of the same description previously produced—I believe that plaintiff has more specifically revealed some of the ultimate facts upon which it bases its case. Of course, you may disagree with me on that statement.

"Prior to hearing counsel on the motion, in order that you might direct your arguments toward the problems which I perceive now to be before us, I should like to comment further.

"1. Defendants contend that plaintiff should reveal more facts which it has ascertained from its examinations of documents previously produced.

"Several times in their reports counsel for Lever and Procter state

that plaintiff concedes that it has facts and that defendants are entitled to them substantially in advance of trial, but that at this time the plaintiff will not reveal these facts. This really goes to the crux of the motion, I believe, now before the Court because I believe that as more facts are revealed to the defendants they will voluntarily produce documents relating thereto.

"I am convinced of that. I don't know whether the Government is, but I am.

"Thus Item 3 in the Court's letter to counsel dated October 22, 1954, is the starting point for today's argument. 'At this time is it unreasonable to ask plaintiff what facts it has determined from the many documents already produced? Is the case ripe for a statement of facts by the plaintiff? If not, when?'

"One of my concerns is that since plaintiff has been preparing its case for probably three years, or longer, how long must we wait for defendants to prepare their case? The sooner defendants are informed of plaintiff's factual contentions, the sooner defense preparation can commence—and not before, obviously.

"The 'Tentative Statements of Issues of Fact' submitted by the plaintiff contain some revelations of fact which will aid us on this motion; but as to the general statements therein, perhaps defendants should use interrogatories under Rule 33, which provides that when questions are propounded by a party, it 'shall furnish such information as is available to the party.'

"I want plaintiff's counsel to tell me (1) Does plaintiff now have unrevealed facts? (2) If it does, what objection is there to revealing them to the defendants at this time? And if plaintiff does have unrevealed facts, why doesn't it use Rule 36 pertaining to admissions, then perhaps

certain issues of fact will be eliminated from the case, thereby eliminating the need for the production of documents relating thereto.

"2. Are the 'Tentative Statements of Issues of Fact' sufficiently specific to enable Court and counsel to determine the need for the production of additional documents and to enable defendants to prepare their defense?

"I have found twelve statements that appear to meet the 'how, when, and by whom test.' In the Statement re Advertising and Promotions, paragraph I–B–1 states how —agreement; when—1937; by whom—manufacturing defendants; and what—limitations on advertising and promotional expenditures for established brands.

"So, as to that statement, while preparing their case, defendants know that the plaintiff will offer evidence to prove that in 1937 the manufacturing defendants entered into an agreement imposing limitations on their advertising and promotional expenditures for their established brands; and, secondly, any documents which evidence such an alleged agreement are a relevant subject in a discovery motion.

"Also in the Statement re Advertising and Promotions, paragraph I–B–2 appears to be sufficiently specific for our twofold purpose, as do paragraphs II–B–1, II–B–3 and II–B–4 in the same Statement.

"Now, in the Statement re Glycerine, the following paragraphs appear to be sufficiently specific: I–A–2, I–B–1, I–B–2 and I–B–3.

"And in the Statement re Tallow and Grease, paragraphs I–B–2, I–B–3 and I–B–4 appear to meet our test and purpose.

"An example of the importance for plaintiff to reveal facts is shown by comparing its Statement re Advertising and Promotions, para-

graph I–B–1, with the sole allegation in the complaint relating to the fact of limitations on expenditures, which is on page twelve of the complaint, Item 7, 'By controlling, manipulating and fixing amounts which they expend for promotions and advertising.'

"Compare that statement with the new statement, 'In 1937 the manufacturing defendants reached an agreement imposing limitations on their advertising and promotional expenditures for their established brands.'

"From the latter we now know two factual contentions—(1) agreement, (2) 1937—which were not revealed in the complaint.

"Thus as to the prices; advertising and promotion; glycerine; tallow and grease, plaintiff has stated some of the ultimate facts upon which it will rely. My comments on plaintiff's new Statements were not intended to be exhaustive, but only to illustrate my tentative thinking regarding the main objection now raised by the defendants. Of course, I want to hear the views of counsel on the problem.

"3. Has there been compliance with all prior discovery orders, because as I noted in my letter of October 22 it then appeared that some documents were currently being produced.

"4. Modification of the motion. Item 4 in the Court's letter of the same date suggested that plaintiff might desire to modify its motion and the reports by Lever and Procter indicate that plaintiff concedes that some of the material demanded either would be withdrawn or disposed of by stipulation.

"Of course, still we are faced with the problem of how many years back should production be ordered. In plaintiff's Tentative Statements, however, there are date references tied in with certain alleged conduct, as, for example, beginning in 1936 defendants have fixed prices; in 1926 defendants formed the defendant Association; beginning in 1937 defendants established identical list prices.

"Such 'when' information is an improvement over the sole allegation in the complaint as to the date— 'Beginning in 1926 and continuing thereafter,'—which is found on page 10, Item 32 of the complaint.

"I now ask if all counsel agree with Procter's statement at page 10 of its report that we should defer argument regarding a cut-off date? Or should the question now be argued? [16] * * * "

Although plaintiff admitted it had discovered many facts from the documents previously produced, it vigorously argued that defendants did not then need those facts. The court was persuaded that plaintiff improperly had refused to reveal facts even though several days earlier on December 3, 1954, it had submitted to defendants "Tentative Statements of Issues of Fact," relating to: (1) prices and costs, (2) advertising and promotions, (3) glycerine, (4) tallow and grease.[17] While those statements were more specific than the allegations in the complaint (see for example, the court's December 7, 1954, comments, quoted supra), it was obvious that plaintiff could have stated more facts. Believing that in a protracted anti-trust action there must be an early disclosure of facts, the court suggested and the parties accepted a procedure. It was designed to hurdle what the court felt was the only obstacle to defendants' consent to produce some documents and to give defendants the facts relied upon by plaintiff, permitting

---

16. Argument has been deferred.

17. Plaintiff also submitted on February 18, 1955, statements relating to mergers and acquisitions, and patents, and on May 9, 1955, market position.

plaintiff to object to being ordered to disclose any detailed, evidential facts.

"Using the plaintiff's tentative statements of issues of fact as a basis—

"(1) Within ten days from today, defendants submit to court and counsel their questions, such as Mr. Fortas' oral questions in court today, directed to the plaintiff's statements.

"(2) Within ten days after defendants have served and filed their questions, plaintiff submit to the court their objections, and, of course, perhaps as to some questions plaintiff will not object to supplying answers.

"(3) Court will rule on which questions must be answered.

"(4) Then within two weeks of the Court's rulings on the questions and answers, plaintiff serve and file answers.

"(5) Then within one month both parties, either with or without the Court's aid, agree on voluntary production and where there is disagreement the Court will rule and enter orders based on plaintiff's *reframed* motion. As to the time intervals, if counsel believe more time is needed, let's settle it now and there will be no extensions."

Commencing about January 1, 1955, and continuing until January 13, 1955, Procter, Colgate, and Lever submitted their questions relating to plaintiff's tentative statements of issues of fact; for example, one of plaintiff's statements as to prices and costs was "1. In 1926 Procter, Lever, and the three companies which later merged to form Colgate joined with other soap manufacturers to establish the defendant Association for the purpose, among others, of considering joint action among such manufacturers with respect to matters affecting prices." Lever asked five questions relating to that statement: "1. Is the reference to 'such manufacturers' meant to include all the soap manufacturers

forming the Association. 2. Specify the 'joint action * * * with respect to matters affecting prices' for which the Association was allegedly established. 3. Specify the other purposes for which the Association was established. 4. Identify the 'matters' as to which the soap manufacturers are alleged to have considered joint action affecting prices; specify the use or proposed use of the Association in relation thereto; and describe the activities of Lever Brothers in connection therewith. 5. Identify the documents presently in the Government's possession which provide a basis for the allegations and which show that Lever Brothers participated in the activities described in [the statement]." Plaintiff answered the questions: 1. Yes. 2. "To eliminate 'trade wars,' 'cannibalism' and 'forcing' in the manufacture and sale of soap products; to increase the revenue obtainable from the sale of glycerine, the principal by-product from the manufacture of soap." 3. "* * * according to its Certificate of Incorporation, were: '* * * collecting and circulating information valuable and useful to the public with reference to the use of soap and kindred products, * * * investigating the nature and use of glycerine and kindred substances and disseminating information with reference thereto, and * * * promoting the best interests of producers of soap and glycerine and kindred products.'" 4. "The Association was established for the purpose of considering joint action with respect to the following matters allegedly affecting the prices of household soap products and glycerine: excessive glycerine production and supply; excessive household soap production and supply; trade wars; cannibalism; and forcing. The use of the Association in relation thereto was that stated in the issue, namely 'considering joint action.' In this respect, the Association was used as a forum or meeting ground. Lever Brothers, either directly or through its officers and agents, attended meetings of the Association,

served on Association committees, held official positions and memberships on the Board of Directors, voted, paid dues and made other financial contributions to support Association activities, and in general took part in activities of the Association." As to question 5, the court sustained plaintiff's objection to answering it.

January 13, 1955, plaintiff filed a brief objecting to some of defendants' questions. The objections mainly were to questions asking for a designation of documents relied upon as evidence of alleged facts,[18] and to questions asking for detailed evidential facts.[19]

January 25, 1955, the court filed its opinion:

"The procedure suggested by this court and accepted by all counsel during the December 7, 1954 hearing (transcript pp. 97–8) was devised because the defendants properly asked the plaintiff to disclose what facts it had ascertained from the produced documents.

"Pursuant to phase (1) of the procedure the defendants have served and filed questions directed to the plaintiff's Tentative Statements of Issues of Fact, and pursuant to phase (2) the plaintiff has served and filed its objections to answering certain questions.

"At this time, the plaintiff need not designate the documents relied upon or set forth the substance of its evidence of the alleged facts. Although I did not believe that the defendants now would ask for such information, nevertheless, during the hearing on plaintiff's reframed motion (see phase (5) transcript p. 98) I shall hear counsel on the problem. My present thinking is that plaintiff should designate documents

when it completes discovery under Rule 34 after documents are produced pursuant to the reframed motion.

"As to the questions objected to by the numbers listed at pp. 9 and 10 in the plaintiff's Memorandum of Objections dated January 13, 1955, I hereby order that the following questions be answered:

"Procter

"57, 58, 81, 112, 132, 134.

"Lever

"81, 87, 93, 94, 116, 124.

"Colgate

"41, 42, 75.

"As to the questions objected to by the numbers listed at footnote 5, p. 10 of plaintiff's Memorandum, the above orders will guide plaintiff and I shall rely on its good faith in answering those questions in accord with the orders herein and the intent and spirit of Rule 33.

"Within one month after the date on which plaintiff completes the service and filing of its answers to the questions, unless plaintiff requests an extension of time, counsel for both sides will attempt to agree on voluntary production, and where there is disagreement I anticipate the filing of a reframed motion under Rule 34 (transcript, p. 98)."

Pursuant to the court's opinion, on March 2, 1955, plaintiff answered the questions which previously it had objected to answering. Then for the next several months defendants and plaintiff continued to exchange questions and answers based upon plaintiff's Tentative Statements. Finally, on April 19, 1955, after counsel had conferred five times, they appeared in court and presented their consent orders.[20]

18. For example, Lever's question No. 5 quoted above.

19. For example, "state the basis upon which it is alleged"; "indicate all instances"; "describe the information ex-

changed"; "specify the dates, place, quantity, etc."

20. See footnote 1, *supra*. Since plaintiff had not submitted its Tentative Statement relating to market position, the con-

sent orders did not cover the relevant documents. However, in May, June, and July, 1955, plaintiff submitted its Statement relating to market position, defendants asked their questions, and plaintiff answered them. The parties have not advised the court concerning the so-called market position documents described in plaintiff's Rule 34 motions. Since, however, plaintiff has submitted its Tentative Statement relating to market position and the parties have exchanged questions and answers, it appears that consent orders will be presented.